I will be discussing two issues this morning. The first is the District Court's failure to grant a continuance or even a recess when the government produced an exculpatory video on the very morning of trial showing that no cocaine had been found in Mr. Jeri's carry-on bag and the erroneous exclusion of that video as well as recorded calls between Mr. Jeri and the owners of the cocaine showing that Mr. Jeri did not know that the suitcases that he was transporting for Fancy Lopez contained cocaine. There were no reports, property receipts, or photos showing which bags the drugs had been found in, although the government maintained that the drugs had been found in both the check bags and the carry-on bag. Mr. Jeri's defense is that there were no drugs in the carry-on bag and he did not know that there were drugs in the two check bags. At 830, the morning of trial, the government turned over the video. The District Court denied Mr. Jeri's motion for continuance and trial began at 9 o'clock with jury selection. The District Court did not even permit a short recess to allow defense counsel to view the video. By the time defense counsel viewed the video that evening showing that no cocaine had been found in the carry-on bag, two witnesses had testified that three purses found with cocaine had been found in the carry-on and the case agent had testified that Mr. Jeri had been untruthful in his post-arrest statement when he said that he had no knowledge there was cocaine. Let me ask you a question. As I understand it, the cocaine was found secreted in a number of different items. That's correct, Your Honor. They were in some notebooks. They were secreted in hidden compartments in some purses. They were hidden in some jackets, a number of jackets, and they were also hidden in pillows. When I looked at the film clips, the six minutes that seem most relevant and the rest of it, the items from whence the dope was taken were already out of anything and they were just, all you see it is on a table. There's no indication from the video when they were taken from the bags or from whom, right? Well, what you see, the very first videos that you see, which is 000 and 00001 from camera one, that's where it starts and not camera two. It starts at camera one and the very two videos, the first two videos are showing the search of the carry-on bag. Right, but the stuff is already out of it. Many of the things are already outside of the carry-on bag when you see a Homeland Security agent going through the bag. In other words, you can see, because they pan the whole room and you can see stuff on the table. Right, but there's no search. What I'm asking is, do we know from the video, we can tell when those materials, the notebooks, the purses, the jackets, the pillows, were taken from any of the bags, right? No, we don't. That's why we needed a container. No, no, but the film itself doesn't disclose that answer, does it? No. None of the film? No. Okay. Anyway, Mr. Jerry's right to counsel. There was the video that showed the contraband on the table. The goods were obviously taken before the time the video was taken. Well, they were taken from the checked bags before then, because we see them not, we don't  That's what I understand. We don't see the checked bags at all, and there was 81 clips. With regard to the clear search of the hand luggage that showed the agents taking the clothing out and then putting the clothing back in, does it matter that at that time the following is recorded, just as is being videoed, a question, and this was presumably from the people that were taking the pictures, is this like a procedure, or do you actually think there's still some stuff? Answer from the person that was doing the searching, no, I'm not thinking there's stuff. We're trying to determine, what we're trying to see is, he was on a trip for a week. We want to make sure that he's got enough clothing that would support his story. Well, the first issue is we don't know what they are talking about. We don't know if they're talking about that particular bag. Well, this is the audio that is right on the tape at the time he's putting his hands, he's taking the clothing out, and he's taking folded clothing out of a bag, so the bag opens up and the bags are full of folded clothing as though you went on a trip, and he's lifting a piece out and then putting it back intact. He's not taking the piece of clothing apart and holding it up and looking at it, he's just lifting and putting it back. He took everything out of there and opened it all up and then he put it back. The video doesn't show that. The video doesn't show him opening anything. It just shows him lifting a piece of folded clothing out of the bag, nudging it this way, and then putting it back in. The video I saw, Your Honor, shows all the clothes. We saw, both saw the same video. All clothes being removed. And I also heard, as long as you heard the video, the agent cursing and saying, why didn't you wait for me before you started this search? Now, didn't the judge reject this on the grounds that it was either inconclusive and or it could have been prejudicial? There was prejudice to us by not having it in there, because he completely . . . Yes, this is where I'm having the problem, maybe you can explain it to me. If the dope had already been removed from the bags by the time the film is taken, and I looked at the film, and as best I can tell, the purses were outside, the liquid cocaine was outside, the jackets were outside the bag, the pillow was outside the bag. They had already been removed. We don't know by whom. We don't know by when. All we know is that at the time they're going through the bags, the dope was already out of the bags. The problem I'm having is understanding how this adds much to the evaluation of what Jerry knew or what he didn't know. Judge, respectfully, it is our contention that there were no drugs found in the carry-on. We don't even know . . . Weren't some of . . . wasn't there evidence that some of the purses, in fact, were taken from the carry-on? That's what the testimony was. That's why we needed to see this video and review it and be able to interview that agent in the striped shirt that you saw, who did not testify at trial, and ask him whether or not he was searching and the stuff had already been removed. We still don't know who that agent is. There was numerous other agents there. The bottom line is we had no opportunity to make use of this video. We could have hired an expert. Could you have called the agent? We didn't know who he was. We never saw the video until . . . Once you saw the video, could you have asked for the identification of the agent and then called him? We did ask, and the government did not provide it. There was a motion to compel that was filed. Motion to compel the name? The names, yes, of the film crew and other film witnesses. That motion was denied? It was denied. That was in the course of the trial, the motion was perfected? It was December 13th is when it was filed. Was that during the trial? The trial started December 14th. Okay, so one day before, once you knew there was a video, you asked for the names? Right. But we didn't get the video until 830 that morning. I understand that. He wouldn't even give us a recess to allow us to even look at it. It wasn't until after all the witnesses testified that we looked at the video. I take it there's no suggestion that the government wrongfully withheld or suppressed the information? They gave it to you as soon as they got it? Yes, but as you know, Judge, under Kyles v. Whiteley . . . No, I understand. I'm just trying to find out factually whether there was any suggestion that the government had sat on that form. Not the prosecutors, but the agent, because the agents and two of the Customs and Border Patrol people were there, and they knew there was a film crew. They even testified. One of the agents named Juana testified that, I've never seen a film crew back there in the restricted area before. This was the only time. Judge Moore did point out, so the film crew was there at like four or five in the morning, and the prosecutor said yes. Basically, it was precluded. The judge, when we went to offer it, he didn't care that we had a right to present exculpatory evidence. He called it a red herring . . . I think the essential question, Ms. Barrist, is whether it really was exculpatory. That is to say, with the dope having already been taken out, whether that bore upon or showed a lack of knowledge or intent on the part of the defendant. That seems to me to be the essential question. I guess what would be helpful for me is for you to explain to me in particular how the dope having been removed earlier, the search of the bag would have illuminated anything about his state of mind or knowledge. Well, first of all, Judge, we are not contending that the dope was removed from the carry-on bag earlier. We just have the two officers who we contend are lying, and we would have . . . No, no, but I guess the point I'm trying to make is if you look, forget what anyone said. If you just look at the film, there's one clip where the officer is going through the bag, and when he's finished, the camera pans the room, and you can see the stuff from whence the dope was taken are already out on a couple of tables. You can see the purses, the notebooks, all of that's already out. It doesn't depend on the testimony of anyone. You can see that the receptacles, the vessels from whence the dope came, already were outside the bag. Have I misapprehended that? That is one interpretation. Had we been presented with the video and allowed to interview the witnesses, we could have determined whether all that dope also included stuff from the carry-on bag, because if you look at all eighty-one of those clips, there is nothing showing the checked bags. The only thing is the carry-on bag, and I'm running out of time, Judge, but . . . That's all right. You take your time. Okay. Even if the video itself was not admissible, it could have led to the discovery admissible evidence under Brady, and the district court did not know that because he never even bothered to look at the video, and he just relied on what . . . Tell me what it would have led to. Well, it probably would have led to, we could have had an expert, we could have had an opportunity to impeach the witnesses who already testified, because you can hear the female officer, Laura Sika, on there saying something. We could have interviewed the guy in the striped shirt who was searching the bag. We could have interviewed the film crew. We could have done a whole investigation and found out exactly what was going on, and we had no opportunity to make any use of this evidence. We have a right to be able to view it, and it did pertain to the elements of the charged offense's knowledge. It did have a substantial impact on the credibility of the witnesses, and it certainly placed the story presented by the government in a significantly different light, such that a different way that, together with the controlled calls, when you look at the controlled calls that were excluded, they were recorded for like . . . there was 12 calls. It was four hours after Mr. Jerry was arrested. It was Mr. Jerry and his three alleged co-conspirators. The lady in New York, the lady . . . The controlled calls were excluded on the grounds that they were hearsay, is that correct? Yes, but they were not hearsay. Clearly not hearsay. The calls, in these calls . . . Were there any other grounds on which the judge excluded the controlled calls other than hearsay? He said that they were irrelevant under 403, but they were clearly not relevant. In fact, they were totally relevant because they went to his defense. They were not overwhelmingly prejudicial because the government is the one that made the calls. The agent made the calls. Did they tell him, this was after the arrest had occurred, he agreed to help them? Yes. He agreed to make controlled calls to Lopez? It's Lopez, the woman in New York? Bear with me for a second. He agreed to make the calls. Did not the agents instruct him what it was he was supposed to say? Yes, but he didn't instruct the people on the other end. No, no, I understand that. But they told him what to say post-arrest. Right. But then when he says, I think there's drugs in here, Fancy Lopez says, no, it's not. What you see leaking is vitamins. And then she gets her sister and puts her sister on the phone, the one who gave the bags from Peru. And she said, no, it's a box of oregano. And then they have another woman who actually came to Miami. She lived in Miami. She and her husband, it was in the testimony, met with the agent. This is like days after trying to still get the bags because they clearly did not know that Mr. Jerry had been arrested. Otherwise, they never would have shown up to get the bags. That woman is saying, no, what you're seeing is cornmeal or cornstarch. The bottom line is that they're not here, say, because they were not being offered for the truth of the matter asserted. They were not being offered to prove that there was vitamins in there or cornstarch or oregano. They were being offered to prove the lies being told to Mr. Jerry to encourage him to continue with his trip on to New York. And the government's failure to even address Mr. Jerry's argument in its brief that the calls are hearsay is a tacit confession that they were not. No hearsay exception is needed since they were not hearsay. The bottom line is, had the jury been able to hear the calls and view the video and been presented with the proper impeachment of the government witnesses. And whatever other witnesses and evidence the defense would have been able to develop based on that video. In short, had the district court not precluded Mr. Jerry's entire defense, it would have put the evidence presented by the government in the appropriate context. With the jury likely to have returned a not guilty verdict. Because these were preserved constitutional errors and the government has not proven beyond a reasonable doubt that these errors did not contribute to the convictions. This court must reverse Mr. Jerry's convictions and remand for a new trial. All right, why don't we, we've gone already five minutes over. I was just going to tell you that with respect to the other three issues, we stand on our brief unless you have questions. No, but we'll give you the full rebuttal time that you preserved. Thank you. Thank you. May it please the court, Philip DeRosa on behalf of the United States. And with me at council table, I'd like to introduce Assistant United States Attorney, Kerry Aronowitz, who was one of the two AUSAs prosecuting the trial of the case. I just want to make a comment about the video with respect to the motion for continuance. I think it's important to remember that when they looked at the video, the defense saw the video on the night of the day that it was given to them. At that point, the government's case was still ongoing. So they saw the video and had time to use it during their case in chief or whatever. Did the government know of the existence of the video at the moment the trial was beginning? No, at the moment the trial was beginning, yes. The government found out about it. They didn't say anything like, wait, judge, there's an actual video here of the search as far as we know, and maybe we ought to just slow down here a little bit and have a look at that video because it's very unusual that you have a video of a drug search. They did that. I mean, it was brought up on the morning of trial that the video had been . . . And the other side asked for a continuance, right? Say again, Your Honor? The other side said, can we have a continuance, Your Honor? Yes, sir. And the government says, no, you don't need a continuance. Just move on. We've already got some testimony in the can. Maybe we'll get some more in the can. It's hard for me to stand here and tell you that the district judge probably should have looked at the video before he denied the motion. So there's six hours of video. He looks at none of that. They make a motion really before the trial begins. He says denied, and that's basically the state of the record. Well, I wouldn't go that far, Your Honor. Let me make two points on that. First of all, if you look at the judge's later denial of the motion for new trial, it's clear by that time the court has looked at the video. The court probably did not look at the video before denying the motion for continuance. But you have to consider that there was evidence at trial . . . And at the time that the judge is looking at that after the trial, he's looking at it through the filter of what the evidence has come in, right? And so he's making a judgment, and he makes the judgment about the video. Well, it's inconclusive, and it wouldn't have had effect, and it might have been prejudicial. Consider this, Your Honor. The judge heard argument on this from both the government and the defense. He heard nothing from the defense that would have caused him to think that he should grant a continuance to look at this video. Well, this is at the time the motion for the continuance is coming before, as I understand it, Mr. Jerry had a chance to have his counsel look at the video. So the video is on the table. The trial is cranked up. Some witnesses have already testified. And the defendant comes in and says, wait a second, can't we slow this thing down because there's a potentially material piece of evidence here that we haven't had a chance to look at, the judge hasn't had a chance to look at? You're right. There's no question. I mean . . . And the judge says, oh, fire up the engines. My sense is that . . . And then later on afterwards, the judge says, oh, I can explain why I did all this. My sense is that the district court heard the government's proffer and accepted it as true. Now, whether or not that was . . . The proffer was of the video. This is right before the . . . there's a motion to hold the trial up. And the discussion about the video is right up front? Yes, sir. So what was the proffer of the government? What's the government saying? The government has seen the video. The government tells the district court what's in the video. And the government says this is irrelevant to the issues at trial because this is basically a . . . And the judge makes an exclusion order based on . . . There's no reason not to believe the government. But on the other hand, there may be another side to the story. That's true. So isn't it difficult for you to stand here today and tell us there was an error? I'm telling you it's difficult. I think I've said that two or three times. I probably would not have done the same thing. I probably would have looked at the video myself before making an independent ruling and denying the motion for continuance. It's hard for me to stand here and tell you that the judge made the right decision without looking at the video. Okay, so where does that . . . Where does that leave us? Tell me where that . . . After the fact, whether or not the judge made the correct ruling, that the video should have been excluded. And so it's moot. This is an academic exercise. Even if that's so, your adversary has laid down to me some interesting data points, which is that if that video . . . if there had been a motion for a continuance, she would then have had an opportunity to formulate possibly a whole series of lines of argument. She'd like to know who did it. She'd like maybe perhaps some witness. She'd like to call. She might have been armed with some arguments that she might make if she wanted to call the people who were actually doing the searching and ask them. And all of that was blocked out because by the end of the game, when the judge says, well, it was okay for me to exclude it, it was too late for her ever to formulate any of those positions. I don't think that's entirely accurate, Your Honor, because like I said, she looked at the video while the government's case was still going on. You say she looked at it. How long did the trial last? A day. A day and a half. So you had six hours of tape. Trial begins in the morning. The motion is made. It's discussed. It's denied. The jury is selected. The witnesses go on. That night, they get a chance to review the video. There's still some trial left the next day. They finish up the next day. It goes to the jury the next day? Yes, sir. It would be fair to say there wasn't much time to digest six hours of tape. Maybe it didn't matter. Maybe it's not exculpatory. I don't know where you're getting six hours of tape from, Judge. I mean, there's 81 clips here that average about a minute each. We're talking about 81 minutes of film footage, most of which isn't even pertinent at all because it shows pictures of planes flying in the air and cars driving through the airport. Certainly, if you were a defense counsel, you'd want to look at every single piece of the tape because you'd say this may be a goldmine. I'm not following the thread here because what I'm saying is she had an opportunity to look at it when the government was still putting on its case. So if anything had come up in that video that she really thought was useful, she still had an opportunity to say, Judge, we've looked at the video, and now that we've seen it, we can make use of this in our case. But there wasn't that argument. Let me ask the question this way, Mr. DeRosa. Assume for the purposes of my question that the judge should have slowed down and should have said, as you've essentially conceded, let's take a look at this. Let's see what there is. We'll pick the jury tomorrow or the day after, and we'll see where we are there. He didn't do that. The essential question as I see it is, does it matter? Is there some reason, probability it would have made a difference? Is there something arguably exculpatory in it? Ms. Barrist argues that there are two things that are arguably exculpatory, if I have the essence of her argument. The first is you see an agent going through the carry-on bag, and plainly he finds nothing in it, and that tends to suggest a lack of knowledge on the part of the defendant, and it corroborates by that account his defense that he did not know he was duped. The second argument she makes is, and she states it at a very high order of abstraction, but she says it might have provided additional stuff for impeachment of the agents who testified. Did it matter? You tell me. Zero probability. Why? Well, I think it's important to recognize that the basis of her argument, that these are exculpatory, is distilled in the fact that she said three times in both her initial brief and her reply brief that the video shows the carry-on bag being opened, as if to suggest that the crew filmed it as it was being opened for the first time and that there were no drugs there. That's not true, and you've already seen the clips, so you know that the two clips that show the carry-on bag show the bag already opened, and that is in the context of all the other clips showing all of the... The clips show the bag, one clip of the bag being closed, and then there's a clip of it open. So it was being opened by the, it was, the bag is standing there, and then they open the bag up. That's not on film. The bag being opened is not on film, Your Honor. The bag already opened is on the film, and that's in the context and in conjunction with the view of ten purses on the table. Now, you can count the purses. You look at the table. The camera lingers over the ten purses. You can count them. That's how many purses there were. Officer Lacerica and Officer Iguina both testified that there were ten purses, that three of those ten purses were taken out of the rolling carry-on bag. That's what you see on the table, ten purses. All you have is the testimony that they were already taken out of the bag. And you have further context here because if you look at their testimony at trial, they've said that we took them. Let me ask you just to follow up on what you just said, Mr. DeRosa. Yes, sir. Three of the purses, the purses and the jackets and the notebooks, were already out of the bag. That's clear because you can see it on the table when they pan the room. What testimony is there and from whom about who and when they were taken out and from whence they came? There's some testimony about that, right? There's some testimony, yes. You're talking about at the initial secondary inspection when they first discovered it or when everything was pulled out later on in the enforcement area? Well, we know that at some point, but before he searches the bag, the items that contained the drugs had already been removed from the bag or had been removed from something. What testimony is there about that? Well, the testimony starts with Officer LaSarica and Officer Iguina, who testify that once we discovered a couple of packages in one jacket and in the false bottom of one purse, Mr. Jerry would think that the jacket and the purse were found where? At the secondary inspection station outside of this room that you see in the video. Right, but were they found in the bag? I mean, where exactly did they get the jacket and the purse? I don't know whether it's a checked bag or the carry-on. So that's not clear from the evidence? That's not clear from the evidence. All you know is that the first item was a jacket that was taken out of a suitcase and handed to Officer LaSarica, who put it through the X-ray and saw the packages. Wasn't there testimony that said we're really not sure, all of the drugs that are on the table, we're not sure out of which bag any of them came? No, sir. That's not the import of the testimony. What's exactly the words of the testimony on that point? The words of the testimony were we took out ten purses, we took three purses out of the carry-on bag. I understand about the purses, but I thought when the question was asked about focusing on whether or not material had actually come out of the carry-on, it was inconclusive. I'm not following. I thought the judge was saying, well, they already had a chance to explore the question of whether or not to impeach him on witnesses on what came from where. The testimony was that ten purses came from all three bags. You don't know beyond three of those purses coming from the carry-on how many came from the other two bags, whether one had seven in it or whether the other had six and one or five and two. Did every purse have drugs in it? Yes, ma'am. Every purse had a false bottom, which was like a rubber bottom, and inside that rubber bottom was at least one bag. All ten purses had drugs in them? Yes, ma'am. And the evidence shows that? Yes, ma'am. All right. So, therefore, three that came out of the carry-on had drugs in it? Yes, ma'am. In a false bottom? Yes, ma'am. All right. And then also found were some notebooks, and there were drugs secreted in the notebooks as well? Notebooks, I think they were cookbooks, and maybe in the form of notebooks they were in the drugs. They were sort of sealed within it somehow. Yes, in the backing, the hard backing of the cover. Do we know from the testimony where those notebooks came from, whether it came from the carry-on bag or the check bag? We do not. Okay. And what about the jackets themselves? There were how many of those? Seven. Each of which had cocaine secreted in the lining? Yes, sir. And all we know is they came from the bags in the aggregate. How many came from one bag as opposed to the other we don't know? Correct. And then the final item was liquid cocaine? Two bottles of Pisco that were not in the carry-on. I don't think there was any testimony about specifically what bag that came out of. That contained liquid cocaine? Correct. Okay. So the only item that there was specific testimony on that came from the carry-on bag was three purses with false bottoms, each of which had drugs in them. That testimony came from both the officers who were there at the secondary inspection station and took the three purses out of the rolling carry-on bag. On the control calls, your adversary says that the judge excluded them for the wrong reasons, that they're not hearsay. I'm having trouble keeping up with the arguments because . . . Are they hearsay, yes or no? They are hearsay. In fact, her argument on her . . . Are they being offered for the truth statement or not? The last argument in the reply brief before she appeared in court today was that they were hearsay, but that they satisfied the hearsay exception under 8033 to show Fancy Lopez's state of mind. That was the argument, that it was hearsay, but it satisfied a hearsay exception. And the government's response to that was, Fancy Lopez's state of mind is not relevant, and that's why the judge kept it out. Now she's saying . . . This is the third argument I've heard in a different forum. Now she's saying that, no, it wasn't hearsay. It was for the truth of the matter. Well, you're asking for hearsay statements to come in to prove the truth of the matter, that Max Gehry didn't know that there was cocaine in the suitcase. You can't do that. I mean, if it's truth of the matter, it still doesn't satisfy the hearsay exception. So it's either hearsay or it's truth of the matter. It's not truth of the matter. If Lopez had made an inculpatory statement, would that have been hearsay? If in the course of the dialogue with the defendant, Lopez had said something that incriminated Lopez, would that have been hearsay or would that have been admissible? That would have been hearsay, Your Honor. It would still have been hearsay? Yes, sir. Why? Well, because she's a declarer. She's the declarer of the statement. She's not there to say what it is they're trying to get into evidence. So that's hearsay. It's an out-of-court statement. Suppose she said it's true there was dope in the bag. I'm sorry. I didn't tell you, but we secreted it in the jackets. We secreted it in the notebooks, et cetera. Are you telling me that that would have been inadmissible? Would it be a declaration against the penal interests of Fancy Lopez? It would have been a declaration against it. Why wouldn't it have been admissible then? And if the answer is yes, if it's a false exculpatory statement, why wouldn't it come in on that theory as well? If it's false exculpatory, then it's not going to help him. How do we know that she's telling the truth? Okay, so now we're moving on to grounds of relevance as opposed to whether it's inadmissible because it's inherently untrustworthy, right? Right. It's inherently untrustworthy because we don't know whether she's lying or not. Because it seems to me the more serious question is how could it have been relevant if they put him up to have this conversation unless there was something that came out from the mouth of Fancy Lopez. I'm sorry. I set you up. I shouldn't have done it. That would have been most assuredly relevant to the defense of lack of knowledge on the part of the defendant, but you don't have anything like that. You do not, Your Honor. You have no other questions, and thank you. I have a question. Sorry, Your Honor. Is there any reason why the government doesn't notify the defendant that their agents are going to also testify as experts? I've had a lot of cases where government just routinely says because we know the agents got to get into their opinion about what drug couriers do, about the drug trafficking trade, how it works. They get into this opinion area. Is there any reason why the government can't just notify the defendant that the agents are going to get in and testify as experts? No reason at all the government can't. There's no downsides? The government did that in this case, Your Honor. You did give notice here? Yes, Your Honor. Okay. You're talking about the only expert who testified, and that was Special Agent Suarez. The government sent his curriculum vitae and told . . . I'm talking about even other agents who wander into other testimony. Now you're talking about Special Agent Escobar. Right. The only reason he wandered into this is because the court ruled that the defense opened the door to allow him to testify to certain areas that he normally wouldn't have. It seems to me that often this occurs, that they get into routine practice of drug traffickers, and you get borderline into lay versus expert. Is there any reason why you don't give notices to all of the agents to avoid this issue? I've seen the government do it in many cases, but some cases they don't. They'll do just like here, one . . . It's not a bad suggestion. It's kind of like 404B where the government says everything we've turned over could be used as 404B. I guess they could say the same thing about an agent, but when they're preparing the case, they're not expecting to use this agent as an expert, so it doesn't occur to the government. Okay. You've answered my question.   Yes, sir. I'm sort of perplexed about how it is that a film crew from some private film organization gets into the customs enclosure and just starts filming away materials in connection with a seizure and a bust that had just occurred. Is this a common occurrence? Can we tell anything from the record about any of this, or is this all stuff that we can discern nothing because the record is notably silent? I think the record is notably silent, and you have to make inferences based on what little is there. You bet. I mean, we know that . . . You understand the reason I raised the question. I do, and it's . . . I don't . . . I'm not sure why you're asking the question, but I recognize that these things happen. Well, I'll tell you why I'm asking the question so I can be as plain and up front as I can be. If you've got private camera crews roaming around MIA, taking pictures every time there's a bust, going through the records, going through the materials, recording statements made by various agents, and this stuff is unbeknownst to a defendant in a case, they just don't bring it to the prosecutor's attention, you can have stuff in there that may be most material and relevant and germane, and it may very well be highly exculpatory in nature. And I'm just concerned about a process and a practice about which you know precious little. I'm not saying they're not entitled to allow a film crew in there. That's not my point. I'm simply saying if this is a common kind of occurrence, you've got some real concerns and issues here that occur in the course of the actual arrest and the search and the seizure. The answer to me is that may be very interesting, Judge Marcus. We can tell nothing from this record, thank you very much, which is, I think, what I hear you say. Yes, it's notably absent. But I think there are certain things we can tell from the record, and that is that I don't know how often this happens because that's not clear from the record. But the fact that it happened in this case, it raises certain legitimate concerns. But I think, in my opinion, that this was a very circumspect way of dealing with a crew that wanted to film something for a television show. Everything was done in the aftermath. They didn't let this crew just start filming an inspection at a secondary inspection station. Everything was controlled, and it was circumspect because all they were allowed to film was the aftermath, after everything had already occurred. And at that point, it's like the district judge ultimately determined, that's really irrelevant to whether or not the defendant knew there were drugs in the suitcases when he imported them from Peru. They also filmed him walking away in handcuffs, right? I don't know if that was him or not, Your Honor. I mean, that, you know, it could have been someone else. Well, you could only see the back. You could only see the back. So, you know, what can we say about that? We have to draw inferences. Again, I thought that was rather circumspect, the fact that they didn't film his face. It shows you that there was some control and limits placed on this film crew when they were doing what they were doing. Thank you very much. Thank you, Your Honor. First of all, Judge, with regard to that, we specifically demanded the memorandum of understanding in our motion to compel between HSI and the film crew. That was denied. With respect to my argument that this is hearsay, that I'm saying it's not hearsay for the first time, in fact, on December 10th at the calendar call, the defense counsel said, Judge, this is not hearsay. In my initial brief, I said this is not hearsay. The government didn't even address that. They just went right into the fact that it is hearsay. Here's the hearsay exceptions. With respect to the controlled calls, what you said about there's nothing exculpatory, and she could have, I guess, known that Mr. Jerry had been arrested or something, or she would have said something inculpatory. While the calls took place on October 9th for four hours, she continued. This is Fancy Lopez, and the evidence is in there. She continued to text the agent October 14th, 15th, 16th, November 2nd, 4th, 5th, 6th, December 1st, trying to get those suitcases. Had she known Mr. Jerry was arrested, then she wouldn't have been trying to get the suitcases. Also, there was a meeting at Doral with her cousin and another individual where they went and tried to get the suitcases, and then they left. They didn't take the suitcases. There was a question about what was found exactly, what and where it was found. In fact, the testimony is that, if it is to be believed, the only drugs that were found in the carry-on, if you believe it, which I don't, was the three cocaine-laden purses. All the other stuff was found in all the check bags. With respect to this whole discussion about the aftermath and this whole thing about when it was discussed with the judge for the motion for continuance, in fact, the very first day of trial, when they go in there and the defense counsel says, Judge, we have a motion pending. It was filmed last night regarding a filming. I've already ruled on it, is his answer. He moves on. He says it was denied, and she said, Judge, just to make the record, I understand the jury is coming out, but at this point, we believe our ability to effectively represent Mr. Jerry is compromised, not having seen the film of the video seizure. He tells her, You can have a seat. And then the very next day, when they move to try and get those two film clips in, he threatens her with an ethics complaint. He tells her she's trying to smear law enforcement. It's a red herring. It's a waste of time. And he questions whether or not there is, should she go to, can he go to her boss, or is there a place where he can complain about what she's doing because she's attempting to smear law enforcement. Judge, she was just trying to defend her client. We ask that you vacate the convictions and remand for a new trial. Thank you very much. Thank you both, and we'll proceed to the next case.